IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GOODALL OIL COMPANY and
MICHAEL RYAN,

                              Plaintiff,

          v.                                                    OPINION and ORDER

                                                                19-cv-428-jdp
PILOT CORPORATION and PILOT TRAVEL
CENTERS LLC d/b/a PILOT FLYING J,

                              Defendants.

---

For 30 years, plaintiff Goodall Oil Company hauled fuel to a service station in Beloit, Wisconsin. In 2019, defendant Pilot Travel Centers LLC (PTC), the current leaseholder of the service station, informed Goodall that it was terminating the hauling contract and thereafter performed the hauling itself.

The primary dispute in this case relates to what contract governs Goodall's hauling rights. Goodall says that a 1989 agreement between Goodall and defendant Pilot Corporation (Pilot) is controlling, and that the 1989 agreement doesn't give Pilot the right to terminate. Defendants contend that Pilot assigned its rights to PTC in 2001 and that a superseding agreement in 2004 gave PTC the right to terminate the contract "immediately" if PTC chose to haul its own fuel.

In addition to a breach-of-contract claim, Goodall and Michael Ryan (Goodall's president) assert claims for tortious interference and defamation based on allegations that PTC was spreading false rumors about plaintiffs. Defendants assert a counterclaim that is essentially a mirror image of plaintiffs' breach-of-contract claim: defendants seek declaratory relief that Goodall's hauling rights are governed by the 2004 contract. Defendants move for summary

judgment on all claims, and plaintiffs move for partial summary judgment on their breach of contract claim and defendants' counterclaim. Dkt. 43 and Dkt. 44.

Before the court could resolve those motions, it asked the parties to supplement their evidence showing that the court has jurisdiction under 28 U.S.C. § 1332. Dkt. 69 and Dkt. 72. Defendants' supplemental evidence shows that plaintiffs and defendants are citizens of different states. Dkt. 74. And it is reasonable to infer from the complaint that more than $75,000 is in controversy, so the requirements for diversity jurisdiction under § 1332 are satisfied.

Turning to the merits, the court concludes that defendants are entitled to summary judgment on all claims. In 2001, Pilot assigned its rights to PTC, and in 2004, Goodall entered into a new agreement with PTC that superseded previous agreements. Plaintiffs don't deny that the assignment and new agreement are unambiguous and support defendants' view of the parties' rights. Instead, plaintiffs say that both the assignment and the new agreement are invalid or unenforceable for various reasons, but none of those reasons are persuasive. Plaintiffs may have believed that Goodall had the right to continue hauling fuel to the Beloit station "in perpetuity," but those beliefs can't trump the plain language of the agreements themselves.

Plaintiffs' other claims fail for the simple reason that plaintiffs haven't adduced admissible evidence that PTC was responsible for spreading false rumors about them. Plaintiffs ask for more time to conduct discovery to support those claims, but they haven't met any of the requirements for obtaining such relief under Federal Rule of Civil Procedure 56(d).

BACKGROUND

The background facts are undisputed. In 1989, Goodall was the leaseholder of property in Beloit, Wisconsin where it operated a gas and service station. In January 1989, Goodall entered into an agreement with Pilot under which Goodall conveyed its leasehold interest to Pilot. (At the time, Pilot went by the name "Pilot Oil Corporation.") In exchange for the leasehold interest, Goodall received $250,000 and the right "to haul gasoline, diesel fuel and other motor fuels sold" at the station, among other things. Dkt. 51-2, at 3, § 4.

In September 2001, Pilot and Marathon Ashland Petroleum created PTC as a joint venture "to own and operate the companies' respective travel center businesses and related assets." Dkt. 67, ¶ 28. Pilot and PTC entered into what they called an "assignment and assumption of real property lease" in which Pilot assigned its "right, title, and interest" in the 1989 lease agreement to PTC. Dkt. 25-3.

In December 2001, PTC and Goodall entered into an agreement under which PTC would pay Goodall to "pick up and deliver gasoline and diesel fuel" to the Beloit station if Goodall complied with the other terms in the agreement. Dkt. 25-1, at 2, § 1. The agreement states that it "supersedes all previous agreements and understandings between the parties relating to its subject matter." *Id.*, at 5, § 8. It includes a provision that gives PTC the right to terminate the agreement "immediately upon written notice" to Goodall if PTC elects to haul its own fuel. *Id.* at 4, § 4. In October 2004, PTC and Goodall entered into an agreement that included most of the same terms as the 2001 agreement, including those listed above.

The 1989, 2001, and 2004 agreements were signed by Thomas Ryan, who was Goodall's president at the time. Thomas Ryan died in 2013, and his son, plaintiff Michael Ryan, became the president of the company.

3

Goodall continued hauling gas to the Beloit station until 2019. In a letter dated April 18, 2019, PTC informed Goodall that it was exercising its right to terminate the 2004 agreement, effective May 22, 2019. On May 29, PTC assumed responsibility for hauling fuel to the Beloit station.

Hauling fuel to the Beloit station was Goodall's only source of revenue. As a result, Goodall shut down its operations after PTC started hauling its own fuel.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

A. **Breach of contract**

Both sides' theories of their contractual rights are relatively straightforward. Plaintiffs contend that Goodall's 1989 agreement with Pilot was still in effect in 2019, and that Goodall's hauling rights under the 1989 agreement are "absolute and without end." Dkt. 52, at 18. So, plaintiffs say, Pilot, PTC, or both breached the 1989 agreement in May 2019 when PTC took over hauling to the Beloit station.

Defendants contend that Pilot assigned its rights and obligations under the 1989 agreement to PTC in 2001, and that the 1989 agreement was superseded a 2001 agreement between PTC and Goodall and then a 2004 agreement, which gave PTC the right to terminate the relationship immediately after giving notice that PTC was going to take over hauling itself. There is no dispute that PTC complied with the notice requirement in the 2004 agreement, so if the 2004 agreement is controlling, plaintiffs' breach of contract claim fails.

Plaintiffs challenge the validity of the assignment from Pilot to PTC and the validity of the 2001 and 2004 agreements. The court will consider both issues in turn.

4

### 1. Validity of the assignment

The general rule is that a land interest is assignable to a third party. "[E]very transfer of an interest in land conveys full title to that interest, including the right to transfer the interest, unless the conveyance evinces a different intent 'expressly or by necessary implication.'" *Borek Cranberry Marsh, Inc. v. Jackson Cty*., 2010 WI 95, ¶ 23, 328 Wis. 2d 613, 625–26, 785 N.W.2d 615, 621 (citing Wis. Stat. § 706.10(3)).[1]

Plaintiffs don't contend that the 1989 agreement prohibited the parties from assigning their rights and obligations to a third party. In fact, the 1989 agreement anticipates assignments when it says that it "shall be binding upon and enure to the benefit of the parties, their successors and assigns." Dkt. 51-2, at 5. Plaintiffs also don't challenge defendants' contention that the assignment of a land interest carried with it Pilot's obligation to pay Goodall for hauling fuel, so the court need not consider that issue. *See* Dkt. 45, at 12–13 and Dkt. 61, at 5. It makes sense that PTC, as the new leaseholder of the property, would take over Pilot's rights and obligations under the contract, which was about hauling fuel to that property.

Plaintiffs contend that the assignment is invalid for two other reasons: (1) the 1989 agreement required Pilot to obtain Goodall's written consent before assigning its interest; and (2) the assignment violated Pilot's duty of good faith and fair dealing. The court rejects both contentions.

### a. Consent

In support of their first contention, plaintiffs rely on the following provision in the 1989 agreement: "This Agreement sets forth the entire agreement between the parties concerning

---

[1] Both sides assume that Wisconsin law applies, so the court will do the same. *See FutureSource LLC v. Reuters Ltd*., 312 F.3d 281, 283 (7th Cir. 2002).

5

the Premises identified in Exhibit A. And no other promises or agreements or understandings between them shall be binding unless set forth in writing and signed by both parties." Dkt. 51-2, at 5. The court understands plaintiffs to contend that the clause requires consent for an assignment because the agreement doesn't include a provision expressly allowing an assignment.

But the clause has nothing to do with an assignment. It is a merger or integration clause that prevents the parties from relying on parol evidence. *See Town Bank v. City Real Estate Dev., LLC,* 2010 WI 134, ¶ 39, 330 Wis. 2d 340, 360, 793 N.W.2d 476, 486 ("[W]hen the contract contains an unambiguous merger or integration clause, the court is barred from considering evidence of any prior or contemporaneous understandings or agreements between the parties, even as to the issue of integration.").

As defendants point out, the cited provision doesn't apply because an assignment from Pilot to PTC is not a "promise[] or agreement[] or understanding[]" between Pilot and Goodall, who are the only parties to the 1989 agreement. Plaintiffs don't respond to this argument, so they have forfeited the point. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). The court concludes that the cited provision didn't require Pilot to get Goodall's consent for the assignment.

**b.   Duty of good faith and fair dealing**

Wisconsin recognizes an implied duty of good faith and fair dealing in every contract. *Home Valu, Inc. v. Pep Boys—Manny, Moe and Jack of Del., Inc.*, 213 F.3d 960, 965–66 (7th Cir. 2000). Courts have described this duty in different ways. One commonly cited description is in *Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 541 N.W.2d 203, 213 (Ct. App. 1995), which provided several examples of a violation of the duty: "evasion of the spirit of the bargain,

lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." The Court of Appeals for the Seventh Circuit has described the duty as "halfway between a fiduciary duty (the duty of utmost good faith) and the duty merely to refrain from active fraud." *Mkt. St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 595 (7th Cir. 1991). A party may violate the duty even if all the terms of the contract have been fulfilled, *Foseid*, 541 N.W.2d at 213, but the implied covenant cannot override the express terms of a contract, *Wis. Natural Gas Co. v. Gabe's Constr. Co.*, 220 Wis. 2d 14, 582 N.W.2d 118, 121 (1998).

Plaintiffs' argument under the duty of good faith is not clearly articulated. They say: "Pilot Corp., through PTC, essentially pulled the rug out from under Goodall, taking advantage of over 10 years of business by creating a new entity utilizing a former trade name and the same employee with the same responsibilities between the organizations as the sole point of contact." Dkt. 63, at 3. Plaintiffs seem to be saying that the defendants "tricked" them into believing that they were still dealing with Pilot when they were really dealing with PTC.

There is no evidence that defendants were trying to deceive Goodall. In fact, it is undisputed that Pilot's assignment to PTC in this case was part of a much broader effort to assign its interests in *all* of its stations to PTC. Dkt. 67, ¶ 28. The decision had nothing to do with Goodall. But even if plaintiffs were confused about which entity they were dealing with, they don't explain how their confusion relates to any duty in the 1989 agreement or how it affects the validity of the assignment from Pilot to PTC. The assignment didn't change any of Goodall's rights under the 1989 agreement, so there was no prejudice to Goodall from the assignment itself.

Plaintiffs also suggest that Pilot acted in bad faith because it didn't give Goodall notice of the assignment. Defendants say that they did provide notice at the time the assignment was made, but the dispute is immaterial. Plaintiffs don't cite any authority for the proposition that an assignment is invalid in the absence of notice. *See* 2 State Bar of Wisconsin, *Contract Law in Wisconsin* § 9.30 (5th ed. 2019) ("As a general rule, notice to the promisor is not necessary for an effective assignment."). In any event, Goodall received notice of the assignment when it entered into the December 2001 agreement with PTC, as will be discussed in the next section. Plaintiffs identify no prejudice they incurred between September 2001 (when the assignment was made) and December 2001, so the court sees no basis for a bad-faith claim. *Cf. Mowry v. Crocker*, 6 Wis. 326 (1857) (delay in receiving notice of assignment didn't provide a basis for invalidating assignment when delay didn't cause prejudice).

## 2. Validity of the 2001 and 2004 agreements

The parties discuss the 2001 and 2004 agreements together. That is, both sides assume that if the 2001 agreement is valid, then so is the 2004 agreement, and vice versa. So the court will focus primarily on the 2001 agreement.

The parties agree that the question is whether there was a "novation," which is simply a legal term for substituting a new contract for a previous one. *See State Med. Soc'y v. Associated Hosp. Serv., Inc.*, 23 Wis.2d 482, 490, 128 N.W.2d 43 (1964). The requirements for a novation are essentially the same as elements for the formation of a contract. The questions are whether the facts show that the parties consented to the substitution and whether there was sufficient consideration to support the new obligation. *See Siva Truck Leasing, Inc. v. Kurman Distributors, Div. of S. Abraham & Sons, Inc.*, 166 Wis. 2d 58, 67–68, 479 N.W.2d 542, 546 (Ct. App. 1991);

WIS JI–3034. Plaintiffs say that neither requirement is met.[2] They also contend that the 2001 agreement is invalid because it represents a breach of the duty of good faith and fair dealing in the 1989 agreement.

### a.  Consent

The 2001 agreement expressly states that it is between PTC and Goodall and that Goodall was agreeing to "pick up and deliver gasoline and diesel fuel" to the Beloit station for PTC. Dkt. 25-1, at 2, § 1. The agreement refers to PTC and Pilot as separate entities. *Compare id. with id.*, § 9. The agreement also states that it "supersedes all previous agreements and understandings between the parties relating to its subject matter." *Id.*, at 5, § 8.

It is undisputed that Goodall signed the 2001 agreement, and plaintiffs do not point to any ambiguities in the agreement. The language of the agreement makes it clear which entity Goodall is contracting with and what the subject of the agreement is. The parties didn't call the 2001 agreement a "substitution" or a "novation," but that isn't required. *See Navine v. Peltier*, 48 Wis. 2d 588, 594, 180 N.W.2d 613 (1970) ("It is not required that acceptance of the terms of novation be shown by express words, but it may be implied from the facts and circumstances of the transaction and the conduct of the parties in relation thereto."); *see also*

---

[2] Plaintiffs enumerate slightly different elements for novation in their brief: "1) a previous valid obligation, 2) an agreement of all the parties to a new contract, 3) the extinguishment of the old obligation, and 4) the validity of a new one." Dkt. 52, at 10. But those are elements for a novation under *Illinois* law, not Wisconsin law. *See, e.g., Grundstad v. Ritt*, 166 F.3d 867, 871 (7th Cir. 1999) (applying Illinois law). Plaintiffs cite *Brooks v. Hayes*, 133 Wis. 2d 228, 244–45, 395 N.W.2d 167 (1986), but that case doesn't include the elements listed by plaintiffs. *Id.* (summarizing a novation as follows: "[i]f there is an agreement between the obligor, obligee and a third party by which the third party agrees to be substituted for the obligor and the obligee assents thereto, the obligor is released from liability and the third person takes the place of the obligor"). In any event, the elements under Wisconsin and Illinois law aren't significantly different, so the court will consider plaintiffs' arguments under the Wisconsin standard.

*Vielie v. Aurora Pharmacy*, Inc., 2005 WI App 126, ¶ 15, 284 Wis. 2d 570, 699 N.W.2d 253 (nonprecedential) (concluding that a novation occurred even though "the parties never expressly called the [new] agreement a 'substitution'"). So the court concludes that the element of consent is satisfied.

Despite the plain language of the 2001 agreement, plaintiffs say that there was no meeting of the minds because Goodall still believed that it was contracting with Pilot. This argument fails for two reasons. First, a party's subjective beliefs can't overcome the clear and unambiguous language of a contract. *Tufail v. Midwest Hosp., LLC*, 2013 WI 62, ¶¶ 25-26, 348 Wis. 2d 631, 642–43, 833 N.W.2d 586, 592. Second, even if the court could consider extrinsic evidence, plaintiffs cite no contemporaneous evidence about what Goodall believed when it entered into the 2001 agreement. Ryan says that *he* believed in 2013 (when he took over the company) that the 1989 agreement was still controlling, but Ryan doesn't say that he was involved with negotiating any of the agreements at issue or that he was even involved with the company in 2001 or 2004. *See* Dkt. 47 (Ryan Dep. 12:2–17) (testifying that he didn't hold any positions at Goodall between 1982 and 2013). So Ryan has no foundation for testifying about Goodall's knowledge or intent at the relevant time.

Plaintiffs instead argue that the 2001 agreement never took effect because the parties continued acting as if the 1989 agreement were controlling. But this argument also fails for multiple reasons. First, it isn't correct that the parties ignored the 2001 agreement. As plaintiffs acknowledge, the 2001 agreement included rate increases for Goodall that went into effect after the agreement was signed. It's also undisputed that Goodall complied with a requirement in the 2004 agreement to add PTC as an additional insured. Dkt. 65, ¶ 28. Plaintiffs do not explain how some parts of the agreements could take effect but others did not.

10

Second, plaintiffs provide no legal basis for their argument that the parties' course of dealing *after* entering an agreement could prevent the agreement from taking effect. This appears to be another attempt to rely on extrinsic evidence to overcome the agreement's plain language.

Perhaps plaintiffs mean to argue that the parties' course of conduct shows that they modified the 2001 (and later the 2004) agreement so that it retained some of the terms of the 1989 agreement. But if that is their argument, it also fails. "The acts relied upon to modify a prior contract must be unequivocal in character, and acts that are ambiguous as to whether a modification was intended are not sufficient to establish a modification." *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 853 (7th Cir. 2005) (applying Wisconsin law). In support of their contention that the parties treated the 1989 contract as controlling, plaintiffs say that: (1) in 2013, PTC's area supply coordinator sent Ryan the 1989 contract when Ryan told the coordinator that he was "try[ing] to understand the relationship better," Dkt. 47 (Ryan Dep. 56:5–7); and (2) in one instance in 2014 or 2015, Ryan followed the process outlined in the 1989 agreement for making changes to the rates rather than the process in the 2001 and 2004 agreements.

This isn't "unequivocal" evidence that the parties decided to disregard 2001 and 2004 agreements and resurrect the 1989 agreement. As for the coordinator's conduct, plaintiffs identify no basis for concluding that she was making any representations on PTC's behalf that the 2004 agreement was no longer binding, or, if she was, that she would have the legal authority to do so. As for the 2014 or 2015 rate increase, plaintiffs say only that *Ryan* followed the process in the 1989 agreement. PTC rejected Ryan's proposed rate, and the parties then renegotiated the rate. Dkt. 64, ¶ 34. Even if plaintiffs' evidence suggests that Ryan believed

11

that the 1989 agreement was still in effect, Ryan's subjective belief isn't enough, as already discussed.

Plaintiffs also cite the testimony of Brian Stickley, a PTC employee who was Goodall's "main point of contact" for "logistics and supply." Dkt. 64, ¶ 33. Stickley said that it would be "very atypical" for PTC to continue a month-to-month contract such as the 2004 agreement for 15 years. Dkt. 55 (Stickley Dep. 30:17–20).[3] Plaintiffs include this observation in the section of their brief addressing the question whether the parties consented to the 2001 and 2004 agreement. But plaintiffs don't explain how Stickley's testimony is relevant to that issue, and they cite no authority suggesting that it is.

Plaintiffs' contention seems to be that Stickler's testimony is evidence that the parties didn't mean for the 2001 and 2004 agreements to govern most aspects of their relationship. Perhaps if the terms of the agreements were ambiguous, past practice could be relevant to show intent. *See Cutler-Hammer, Inc. v. Industrial Comm'n*, 13 Wis. 2d 618, 625-26, 109 N.W.2d 468 (1961). But the relevant provisions aren't ambiguous, so Stickler's testimony isn't helpful.

### b.  Consideration

Plaintiffs contend that "consideration is lacking" for the 2001 agreement because increased rates were the only beneficial change that Goodall received in that agreement. Dkt. 52, at 15. The argument is flawed for multiple reasons.

First, plaintiffs' argument is inconsistent with the authority that plaintiffs themselves rely on. Specifically, plaintiffs cite *United States v. Bachman*, 601 F. Supp. 1537, 1541 (E.D. Wis. 1985), which says that "extinguishment of the original obligation is viewed as

---

[3] After the first year, the 2004 agreement continued on a month-to-month to basis. Dkt. 25-2, at 3, § 4.

consideration for the new, and the new promise consideration for the release of the old, each being consideration for the other." If this is the rule, then plaintiffs received adequate consideration because their obligations under the 1989 agreement were extinguished. Plaintiffs don't contend that PTC or Pilot ever attempted to enforce the 1989 agreement after 2001.

*Bachman* was based on federal common law, and there has been little discussion in Wisconsin case law regarding what qualifies as "sufficient consideration" for the purpose of a novation. But *Bachman* is consistent with the Restatement (Second) of Contracts § 280, comment c. (1981), which the Wisconsin Supreme Court has cited with approval. *See Brooks v. Hayes*, 133 Wis. 2d 228, 245, 395 N.W.2d 167, 174 (1986). It is also consistent with the general rule that fresh consideration isn't required for a modification of a contract. *See Everlite Mfg. Co. v. Grand Valley Mach. & Tool Co.*, 44 Wis. 2d 404, 408, 171 N.W.2d 188, 190 (1969). This view is based on the principle that "the same consideration which existed for the old agreement is imported into the new agreement which is substituted for it." *Brown v. Everhard*, 52 Wis. 205, 8 N.W. 725, 726 (1881). Of course, Goodall continued receiving consideration for the agreements in the form of continued payment for hauling.

Second, even if fresh consideration was required, plaintiffs admit that Goodall received it in the form of increased hauling rates. Plaintiffs say that increased rates weren't "adequate" consideration compared to the loss of "its most valuable right," which was the right to haul gas to the Beloit station "into perpetuity." Dkt. 52, at 15.

This argument is incorrect as a matter of law and as a matter fact. It is wrong as a matter of law because the court doesn't engage in a balancing act to determine the relative worth of the benefits received by each party. "A valuable consideration however small is sufficient to support any contract. . . . The law concerns itself only with the existence of legal consideration

13

because the adequacy in fact, as distinguished from value in law, is for the parties to judge for themselves." *St. Norbert Coll. Found., Inc. v. McCormick*, 81 Wis. 2d 423, 430, 260 N.W.2d 776, 780 (1978) (internal quotation marks and alterations omitted). Under this standard, an increase in rates is sufficient consideration.

The argument is incorrect as a matter of fact because the 1989 agreement doesn't say that Goodall's rights under the agreement would "continue into perpetuity." Rather, it is silent on the contract's duration. "If a contract is silent as to duration, then either party may terminate it by giving reasonable notice to the other party of the intent to terminate." *Oostburg State Bank v. United Sav. & Loan Ass'n*, 125 Wis.2d 224, 234-35, 372 N.W.2d 471, 476 (Ct. App.1985); *see also* WIS JI—CIVIL 3049. So even under the 1989 agreement, both parties would retain the right to terminate; the only additional requirement would be that the parties would be required to provide "reasonable" notice. Plaintiffs don't point to any authority suggesting that the additional protection provided under that standard would be substantial. *See, e.g.*, *California Wine Ass'n v. Wisconsin Liquor Co. of Oshkosh*, 20 Wis. 2d 110, 127, 121 N.W.2d 308, 317 (1963) (upholding finding that 60 days was reasonable notice for terminating long-term distribution relationship).

The court concludes that Goodall received sufficient consideration for the 2001 and 2004 agreements.

### c.  Duty of good faith and fair dealing

Plaintiffs contend that the 2001 agreement itself violated defendants' duty of good faith under the 1989 agreement. Plaintiffs' argument on this issue could be clearer, but the court understands plaintiffs to be saying that defendants had a duty to explicitly tell Goodall that

the 2001 agreement was replacing the 1989 agreement. As already discussed, the 2001 agreement was itself clear notice of the new arrangement.

Plaintiffs do not point to any language in the 2001 agreement that was misleading or even ambiguous. Instead, they say, "[d]ue to the length of doing business with Pilot, Goodall would not be expected to, nor did they, have an attorney review" the 2001 (or 2004) agreement. Dkt. 52, at 14. Plaintiffs don't cite any evidence that Goodall didn't review the contracts before signing it. But even if that is correct, it wouldn't be a basis for granting relief. *See Eder v. Lake Geneva Raceway, Inc.*, 187 Wis. 2d 596, 604, 523 N.W.2d 429, 431 (Ct. App. 1994) ("The failure to read a contract does not by itself affect the contract's validity."). Not surprisingly, plaintiffs cite no authority supporting a view that the duty of good faith relieves a party's responsibility for reviewing a contract before signing it. If courts were to adopt plaintiffs' view, it would subject countless commercial contracts to legal challenge.

Plaintiffs don't allege that either defendant made any misrepresentations about the 2001 or 2004 agreements. And plaintiffs don't allege that Goodall acted under duress, that defendants coerced Goodall into signing the agreements, or that the 2001 and 2004 agreements were unconscionable. The duty of good faith simply isn't a substitute for reviewing a contract to determine whether each party has any objections.

The undisputed facts show that the 2001 assignment and the 2001 and 2004 agreements were valid. As a result, defendants are entitled to summary judgment on plaintiffs' breach of contract and bad-faith claims and on defendants' counterclaim for declaratory relief that the 2004 agreement governed the parties' relationship in 2019.

## B.  Plaintiffs' other claims

Plaintiffs also assert claims for defamation and interference with both a contract and a prospective contract. These claims are based on allegation that PTC spread false rumors that Goodall was going to cease operations because Ryan was seriously ill, and, as a result, Goodall's lead driver quit, and Goodall lost the opportunity to enter into deals with other businesses.

Defendants challenge each of these claims on multiple grounds, but they identify one problem that is common to all of the claims: plaintiffs haven't adduced admissible evidence that PTC made any false statements about Ryan or Goodall or that PTC otherwise intentionally interfered with a contract or prospective contract. Rather, the claims are based on statements from witnesses who said they heard "rumors," but none of the witnesses testified that they heard the information from employees of PTC.

In their opposition brief, plaintiffs acknowledge that they don't have admissible evidence to prove these claims. Rather than concede that defendants are entitled to summary judgment, plaintiffs ask the court for an opportunity to conduct additional discovery under Federal Rule of Civil Procedure 56(d).

The court will deny plaintiffs' request for multiple reasons. First, if plaintiffs believed they needed more time for discovery, they should have raised the matter in a proper motion so that the court was immediately alerted to the problem. Burying the request in a brief simply causes more delay. *See De Jesus v. De Jesus,* No. 11-cv-579-bbc, 2012 WL 13042522, at *7 (W.D. Wis. Apr. 3, 2012). Second, Rule 56(d) requires a party seeking an extension to file a separate declaration or affidavit explaining their reasons for needing more time. Plaintiffs didn't do that, and that failure alone is enough to justify denying their request. *See Kallal v. CIBA Vision Corp.*, 779 F.3d 443, 446 (7th Cir. 2015).

16

Third, and most important, the court of appeals has observed many times that summary judgment is the moment in the litigation that requires the party with the burden of proof to "put up or shut up." *See, e.g.*, *Goodman v. National Security Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). In this case, the parties received a three-month extension for filing dispositive motions, Dkt. 34, and both sides waited until the August 21 deadline to do so. So defendants' motion shouldn't have been a surprise to plaintiffs. To obtain relief under Rule 56(d), plaintiffs would have to show that they exercised reasonable diligence in attempting to conduct discovery sooner and also identify specific discovery that they believe would help them prove their claims. *See Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 864 (7th Cir. 2019). Plaintiffs did neither. "[A] fond hope that more fishing might net some good evidence" isn't enough, *id.*, so the court declines to delay resolution of the case.

CONCLUSION

It is unfortunate that Goodall's business relied so heavily on a single customer and that PTC's termination of the 2004 agreement caused Goodall to shut down its operations. And it may be that Michael Ryan believed that Goodall had an "absolute" right to continue the agreement "in perpetuity." If so, plaintiffs would have been understandably dismayed by PTC's sudden decision to terminate. But a primary purpose of any contract is to avoid disputes about the parties' beliefs and intent and to let the words of the contract speak for themselves. In this case, the agreements at issue make it clear that PTC had the right to terminate the agreement when it did. The court sympathizes with plaintiffs' situation, but the law requires that the court grant summary judgment to defendants.

ORDER

IT IS ORDERED that:

1.  The motion for partial summary judgment filed by plaintiffs Goodall Oil Company and Michael Ryan, Dkt. 43, is DENIED.

2.  The motion for summary judgment filed by defendants Pilot Corporation and Pilot Travel Centers LLC, Dkt. 44, is GRANTED. When PTC terminated its relationship with Goodall, Goodall's hauling rights were governed by the 2004 agreement.

3.  The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered December 18, 2020.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

18